JACKSON REALTY COMPANY, complainant and appellant,

*v.*

MINNIE LEHMAN et al., defendants and respondents.

[Submitted July 10th, 1914. Decided November 16th, 1914.]

1. The authority of an agent or officer of a corporation to do certain acts in behalf of his principal may be inferred from the continuance of the acts themselves over such a period of time, and the doing of them in such a manner, that the principal would naturally have become cognizant of them and would have forbidden them if unauthorized.

2. On the facts of this case, as recited in the opinion, the secretary of the complainant company is deemed to have been authorized by the company to accept the usurious payments in its behalf.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Garrison.

*Mr. Isidor H. Brand* and *Mr. H. S. Stuhr,* for the appellant.

*Mr. Harry W. Lange,* for the respondents.

The opinion of the court was delivered by

TRENCHARD, J.

This was an action to foreclose a mortgage which, on its face, was for $1,300.

The defence was usury and it prevailed in the court of chancery where a decree was entered for the amount due after deducting the statutory penalty for usury.

The facts are as follows: Max Lehman, one of the defendants, desired to borrow money. He learned that he could get it from the Jackson Realty Company, the complainant. He consulted Simon Lubash at his office. Lubash was, at that time, and for some years afterwards, the secretary and one of the active men of the company, and had the company's books at his office.

Lehman was informed by Lubash that he could have $1,300 pro-
vided he gave a bonus of ten per cent. thereon to the company
for loaning it to him. On September 8th, 1908, he paid Lubash
$130, and, on the same day, at the office of the lawyer of the
company, executed a bond and real estate mortgage and received
a check for $1,300. The bonus was paid in cash, Lubash refus-
ing to take a check. The mortgage was to be paid off in install-
ments of $162.50 every three months, together with the interest
accrued at each period. He paid to Lubash $162.50 for each of
the four installments next ensuing after the execution of the
mortgage. When the next installment became due, he informed
Lubash that he desired to extend the mortgage for another year
and not be called upon to pay his $162.50 installments, and
Lubash told him that the company would do this, provided he
paid ten per cent. of the then existing principal, which was
$650. He agreed to this, and paid to Lubash $65 in cash at his
office and Lubash entered the payment in a book and put the
money and the book in the safe. The company did not, during
the next ensuing year, take any proceeding against him to collect
the mortgage because of the non-payment of these installments.
Interest was paid, but nothing on account of principal. At the
end of that year he again informed Lubash that he wished to
obtain another extension for a year during which he would not
be required to pay any part of the principal but would only be
required to pay interest on the amount of principal then due,
which was still $650. Lubash informed him that the company
would extend the mortgage for another year and not require any-
thing on account of the principal, provided he paid the company
another ten per cent. for this accommodation. This he agreed
to and paid $65 in cash. During the next ensuing year likewise,
interest was paid, but no installments, and still the company
took no action. When that year expired Lehman again sought
Lubash, and Lubash told him then that he was no longer an
officer of the company, but that Mr. Goldram had better be
seen. Mr. Goldram was, and since the inception of the company
had been, its president. Lehman testified that he went to Gold-
ram's office and was informed by him that he could have the ex-
tension of the mortgage for another year, provided he paid $25

a month instead of $162.50 every three months; and also provided he paid another ten per cent. bonus. He further testified that he went a few days later to Goldram's office and left with Goldram's son $35 in cash and a check for $28.25, the $35 being on account of the $65 bonus, and the $28.25 being $25 for the first installment on principal under the new arrangement, and $3.25 accrued interest. Goldram admits that this amount of money and the check were left at his office, and both agree that, within a day or two, Goldram came to Lehman's place of business and had a talk. They both agree that, after that talk, Goldram took away with him the money that he had brought there and the check. They disagree as to what was said between them. Lehman says that Goldram told him that he would not receive any checks; that they did not receive checks for that kind of thing; that he must make his whole payment in cash. Lehman further testified that he told Goldram that the check was for a payment on the installment on the mortgage, and therefore there was no reason why that should not be represented by a check; that, as to the bonus, the $35 in cash was intended to apply on account of that; that he would pay him the other $30 in a few days, and that Goldram was satisfied with that, and took the check and the money and left. Lehman's brother corroborates some part of this. Goldram says that he got this check and money; that he did not know what it was about; that he went around to see Lehman, and told him that he would not receive that amount but would have to have a larger amount (how much larger he does not state, nor what amount); and that, further, he told Lehman he must come before the weekly meeting of the board of directors; that Lehman told him he would do so; that he had given Lehman the check and the money, but Lehman gave them back to him and said, "You keep these until I get around before the board of directors," and he did so.

Shortly thereafter, no further payments being made by Lehman, and he having refused to pay the balance of the bonus, the bill of foreclosure was filed.

We are of the opinion that the vice-chancellor properly charged the complainant company with the usurious moneys received by Lubash, its secretary.

It is true that there is no direct evidence that the company received from Lubash the usurious moneys, but it is admitted that it received from him the four installments paid during the first year; aggregating $650, and all payments of interest.

But we think that the conclusion is irresistible that the company had knowledge of the usurious agreements made by its secretary, and that he was authorized to make them.

The rule is that the authority of an agent to do certain acts in behalf of his principal may be inferred from the continuance of the acts themselves over such a period of time, and the doing of them in such a manner, that the principal would naturally have become cognizant of them and would have forbidden them if unauthorized. *Dierkes* v. *Hauxhurst Land Co., 80 N. J. Law 369.*

During the several years covered by this transaction, and until near the end when Goldram appeared, the complainant corporation was represented wholly and solely by Lubash. It was with him that the borrower exclusively dealt. In fact, so far as the borrower is concerned, Lubash typified the corporation. He was the custodian of its books. Lehman made payment of the four installments of principal and all payments of interest to him. It is undisputed that he made all of the usurious payments to him. It is admitted that the corporation received regularly the four installments of principal and the payments of interest during the entire term. Lehman assumed and testified that in each instance he was informed by Lubash that *the company* insisted upon these bonuses before it would make the loan, and later, before it would modify its terms. The company does not deny that it authorized Lubash to make these corrupt agreements. It does not deny that it received these bonus moneys. In every instance the company did the very thing that Lubash agreed they would do when he accepted the money. It had weekly meetings of its board of directors, but for a period of two years it did not foreclose or in any way proceed against Lehman, although he was, if the arrangements made by Lubash were to be disregarded, during this entire two years in continual default to the corporation. After Lehman made the second payment of bonus (the first $65 payment) he was always in default so far as the terms of

the mortgage were concerned. He should have paid $162.50 at four periods during that year, and at four periods during the succeeding year, if the mortgage was not sooner paid off. The company knew that he had made none of these payments, and there is not a scintilla of proof to show that he was ever pressed to make any of them. We think it is incredible that the company would have acted in this way, unless it knew of the corrupt agreements made by Lubash. Of course, knowing of such agreements, it would have repudiated them if Lubash had no authority to make them in the company's behalf.

This conclusion is strongly fortified when we consider the attitude of its president, Goldram, with reference to Lehman's last proposition for an extension. In view of the previous dealings between Lehman and the company, and what we find to have been the facts, we believe that Lehman spoke the truth with reference to his dealings with Goldram, and this notwithstanding the latter's partial denial. Goldram's disinclination to receive the check until he was assured that it represented part of the principal and interest, and not bonus money, and his acceptance of the $35 in cash after he knew, as we find, that it was for a part of the bonus, the balance of which was promised later, shows, we think, that Lubash's usurious exactions were in line with the settled policy of the company.

The decree will be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, BOGERT, VREDENBURGH, HEPPENHEIMER, WILLIAMS—13.

*For reversal*—None.